# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 25, 2014          Decided June 13, 2014

No. 13-5118

REYMUNDO ZACARIAS MENDOZA, ET AL.,
APPELLANTS

ALFREDO CONOVILCA MATAMOROS,
APPELLEE

v.

THOMAS E. PEREZ, IN HIS OFFICIAL CAPACITY AS SECRETARY
OF THE UNITED STATES DEPARTMENT OF LABOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01790)

———

*Julie A. Murray* argued the cause for appellants. With her on the briefs were *Michael T. Kirkpatrick* and *Edward J. Tuddenham*.

*Michelle R. LaPointe* was on the brief for *amici curiae* The Southern Poverty Law Center, et al. in support of appellants.

*Craig A. Defoe*, Trial Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief

were *Stuart F. Delery*, Assistant Attorney General, and *David J. Kline*, Director. *Geoffrey Forney*, Senior Litigation Counsel, entered an appearance.

*Edwin B. Swan*, pro hac vice, argued the cause for intervenors. On the brief was *Carl W. Hampe*.

Before: TATEL, BROWN, and MILLETT, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: The Immigration and Nationality Act creates a temporary foreign worker visa program that allows employers to hire foreign workers when there are not enough qualified and available American workers to fill open jobs. The Department of Labor is tasked with administering the visa program to protect the wages and working conditions of U.S. workers. In August 2011, the Department updated the special procedures that establish the minimum wages and working conditions employers must offer U.S. sheepherders, goatherders, and open-range (cattle) herders before hiring foreign herders.

The plaintiffs in this action are U.S. workers experienced in herding. Although the plaintiffs would prefer to work as herders, they have been forced out of the industry by the substandard wages and working conditions they attribute to the easy availability of foreign herders. The plaintiffs paint a portrait of agency capture, suggesting the Department has, without giving herders or their representatives an opportunity to be heard, administered the temporary worker visa program in a way that gives herding operations access to inexpensive foreign labor without protecting U.S. workers.

The plaintiffs, all of whom had left their herding jobs sometime prior to August 2011, filed this action alleging the Department of Labor violated the Administrative Procedure Act by issuing the special procedures without notice and comment. The Mountain Plains Agricultural Services and the Western Range Association—two groups representing employers in the herding industry—intervened on the side of the government. The intervenors filed a motion to dismiss for lack of jurisdiction and all the parties filed cross-motions for summary judgment in the district court. The district court granted the motion to dismiss, holding the plaintiffs lacked Article III and prudential standing. We reverse the judgment of the district court.

I

The H-2A visa program—created by the Immigration and Nationality Act of 1952 (INA) and amended by the Immigration Reform and Control Act of 1986—permits employers to hire foreign workers to perform temporary agricultural work in the United States. An employer seeking to hire H-2A foreign workers must first seek certification from the Department of Labor that (1) there are not sufficient qualified and willing U.S. workers to fill open positions and (2) hiring foreign workers will not adversely affect the wages and working conditions of similarly employed U.S. workers. 8 U.S.C. § 1188(a)(1). Only after obtaining the Department of Labor certification may the employer petition United States Citizenship and Immigration Services to classify a specific foreign worker as an H-2A temporary worker.

The Department of Labor has adopted regulations by notice-and-comment rulemaking that govern the H-2A certification process. The regulations were most recently amended, again through notice-and-comment procedures, in

2010. Through those regulations, the Department sets minimum terms and conditions employers must offer workers to determine the availability of American workers to fill employers' jobs. *See* 20 C.F.R. §§ 655.120–655.122. The regulations also establish procedures for employers seeking H-2A certification to advertise open positions. *See* 20 C.F.R. §§ 655.150–655.158. Qualified U.S. workers responding to these job offers must be given priority over foreign workers. *See* 20 C.F.R. § 655.135(d). Even after an employer's H-2A application is approved and the employer hires foreign laborers, the employer must continue to provide its American and foreign workers the minimum wages and working conditions laid out in the regulations to ensure the employment of foreign workers does not adversely affect the terms of employment of similarly employed American workers. 20 C.F.R. § 655.122(a).

Employers seeking H-2A certification are required to pay the higher of the Adverse Effect Wage Rate (AEWR), the prevailing wage, or the legal minimum wage. 20 C.F.R. § 655.120(a). The AEWR is a specially calculated wage based on the Department of Agriculture's Farm Labor Survey, which approximates what the prevailing wage would be if not for the hiring of foreign workers. *See* Temporary Agricultural Employment of H-2A Aliens in the United States, 75 Fed. Reg. 6884, 6891–93 (Feb. 12, 2010). Any employer-provided housing must meet standards set by the Occupational Safety and Health Administration. 20 C.F.R. § 655.122(d).

Although the same requirements generally apply to employers seeking H-2A certification for workers in any agricultural occupation, the H-2A regulations allow the Administrator of the Office of Foreign Labor Certification to create special procedures for processing certain H-2A applications. 20 C.F.R. §§ 655.102, 655.120(a). This

"special procedures" exception predated, and was continued in, the 2010 version of the H-2A regulations.

In 2011, the Department of Labor issued two Training and Employment Guidance Letters (TEGLs) providing special procedures for certain H-2A certifications. It published the TEGLs in the Federal Register without having gone through Administrative Procedure Act (APA) notice and comment procedures. *See* 5 U.S.C. § 553. TEGL No. 15-06 establishes special procedures for the certification process for cattleherders. TEGL No. 15-06, Change 1, Special Procedures: Labor Certification Process for Occupations Involved in the Open Range Production of Livestock Under the H-2A Program, 76 Fed. Reg. 47,243 (Aug. 4, 2011). TEGL No. 32-10 outlines special procedures for employers engaged in sheepherding and goatherding operations. TEGL No. 32-10, Special Procedures: Labor Certification Process for Employers Engaged in Sheepherding and Goatherding Occupations Under the H-2A Program, 76 Fed. Reg. 47,256 (Aug. 4, 2011). The 2011 TEGLs update special procedures—also issued without notice and comment—that had long been in place for employers seeking H-2A certification in these occupations.[1] The TEGLs reflect the Department of Labor's belief that the unique occupational characteristics of herding—including spending extended periods in isolated areas and being on call twenty-four hours a day, seven days a week to protect livestock—make special H-2A procedures necessary. *See* TEGL No. 32-10, 76 Fed. Reg. at 47,256.

---

[1] Although the 2011 TEGLs continued many of the policies in effect under the prior special procedures, they also made a number of changes to those procedures, which we discuss in Part III below.

Compared to the general H-2A regulations applicable to most agricultural employers, the TEGLs establish significantly different procedures for herder employers seeking H-2A certification. Among other differences, the TEGLs impose different minimum wage requirements and provide lower standards for employer-provided housing. *Compare* 20 C.F.R. § 655.120(a), *with* TEGL No. 15-06, 76 Fed. Reg. at 47,244–45, *and* TEGL No. 32-10, 76 Fed. Reg. at 47,257–58; 20 C.F.R. § 655.122(d)(1)(i), *and* 29 C.F.R. § 1910.142, *with* TEGL No. 15-06, 76 Fed. Reg. at 47,246–47.

The plaintiffs in this action have substantial herding experience.[2] Each originally came to the United States as an H-2A herder, but left his job due to poor or abusive working conditions. The plaintiffs currently have a lawful immigration status and are authorized to work in the United States, thus qualifying as U.S. workers under the INA and H-2A regulations. *See* 20 C.F.R. § 655.103(b). The plaintiffs have all submitted affidavits declaring they are qualified and available to work as herders. *See* J.A. 45–57. However, the plaintiffs state they are deterred from accepting herding jobs because of poor wages and working conditions, which they attribute to the lax standards established by the TEGLs and prior special procedures. They claim the Department of Labor has, without protecting U.S. workers, allowed employers easy access to a large supply of foreign herders. None of the plaintiffs has worked as a herder since, at least, May 2011. They aver they would prefer to work as herders, but they have not heard of any herding jobs offering decent wages and working conditions. *See id.*

---

[2] Only three plaintiffs are party to this appeal. A fourth plaintiff, Alfredo Matamoros, participated in the district court proceedings but did not appeal.

The plaintiffs brought this action in October 2011. They allege the TEGLs constituted "rule making" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 553, the TEGLs were subject to notice and comment requirements, and the Department of Labor violated the APA by issuing the TEGLs without those procedures. They ask the court to set aside the rules until they are adopted through notice-and-comment rulemaking.

The Mountain Plains Agricultural Services and the Western Range Association intervened in the action. Together, the intervenors' member herding operations are responsible for approximately sixty percent of the lamb and wool production in the United States. Their members employ 1,500 to 2,000 foreign sheepherders at any given time, and additional foreign cattle herders. In their brief, the intervenors state that virtually all of their members' herder employees are foreign workers admitted to the United States under the H-2A program.

The intervenors filed a motion to dismiss for lack of jurisdiction in the district court. All parties filed cross-motions for summary judgment. The district court granted the intervenors' motion to dismiss. The court concluded the plaintiffs lack Article III standing because they have not established a personal injury traceable to the disputed regulations. Alternatively, the district court held the plaintiffs lack prudential standing because they are not within the zone of interests protected by the Immigration and Nationality Act. Having granted the motion to dismiss for lack of jurisdiction, the court did not reach the cross-motions for summary judgment. The plaintiffs appealed.

We begin our analysis by assuring ourselves of our own jurisdiction.

## II

We review de novo a district court's order dismissing a claim under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003). In evaluating plaintiffs' standing at the motion to dismiss stage "we must assume that the plaintiff[s] state[] a valid legal claim and must accept the factual allegations in the complaint as true." *Holistic Candlers and Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012). To establish jurisdiction, the court need only find one plaintiff who has standing. *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009).

Article III of the Constitution limits the jurisdiction of federal courts to "actual cases or controversies between proper litigants." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996). To establish constitutional standing, plaintiffs "must have suffered or be imminently threatened with a concrete and particularized injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

The requirements for standing differ where, as here, plaintiffs seek to enforce procedural (rather than substantive) rights. When plaintiffs challenge an action taken without required procedural safeguards, they must establish the agency action threatens their concrete interest. *Fla. Audubon*

*Soc'y*, 94 F.3d at 664. It is not enough to assert "a mere general interest in the alleged procedural violation common to all members of the public." *Id.* Once that threshold is satisfied, the normal standards for immediacy and redressability are relaxed. *Lujan*, 504 U.S. at 572 n.7. Plaintiffs need not demonstrate that but for the procedural violation the agency action would have been different. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005). Nor need they establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiffs' interest. *Id.* Rather, if the plaintiffs can "demonstrate a causal relationship between the final agency action and the alleged injuries," the court will "assume[] the causal relationship between the procedural defect and the final agency action." *Id.*[3]

In challenging the Department of Labor's 2011 TEGLs, the plaintiffs assert procedural rights under the APA. To establish standing, they must demonstrate the guidelines contained in the TEGLs cause them some personal injury—such as increased competition or lost opportunity.

The competitor standing doctrine recognizes "parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." *La. Energy and Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998); *see also Sherley*

---

[3] In *Lujan*, the Supreme Court gave the example that "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Lujan*, 504 U.S. at 572 n.7.

*v. Sebelius*, 610 F.3d 69, 72–73 (D.C. Cir. 2010). In an analogous case involving foreign labor, the Ninth Circuit held an American workers' union had standing to challenge an Immigration and Naturalization Service decision permitting Canadian crane operators to work in the United States without completing the usual foreign labor certification procedure. *Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374, 1376, 1379 (9th Cir. 1989). The court held the union suffered injury in fact because the agency's action caused union members increased competition for jobs in their industry. *Id.* at 1379. *See also Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 802–03 (D.C. Cir. 1985) ("In this instance, the injury of which appellants complain is not abstract. On the contrary, they allege . . . the INS is allowing aliens into the country to perform work which would otherwise likely go to union members. They charge that those alien workers represent competition which appellants would not face if the Government followed the procedures required by law."); *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970).

Thus, an individual in the labor market for open-range herding jobs would have standing to challenge Department of Labor rules that lead to an increased supply of labor—and thus competition—in that market. But the intervenors argue the 2011 TEGLs do not depress wages or worsen working conditions for U.S. herders. Rather, they claim the TEGLs fulfill the Department's statutory responsibility to create H-2A certification procedures that ensure foreign herders are only admitted to the country if there are not sufficient U.S. workers to perform the labor required, and establish standards to prevent the admission of foreign herders from "adversely affect[ing] the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1). Essentially, the intervenors argue the TEGLs are *substantively*

correct insofar as they comply with the relevant provisions of the INA. But, particularly in a procedural rights case, whether the TEGLs would withstand a substantive challenge is not the relevant question for the purpose of determining whether they cause injury to the plaintiffs' concrete interests. Rather, an examination of the alternatives to the TEGLs demonstrates the issuance of those rules injured American herders.

Without the special procedures contained in the TEGLs, open-range employers would be bound by the general H-2A regulations. *See, e.g.*, 20 C.F.R. § 655.120 (establishing the wage rate employers seeking to hire foreign labor must offer, "except where a special procedure is approved for an occupation or specific class of agricultural employment"); TEGL No. 15-06, 76 Fed. Reg. at 47,244 (describing TEGL as outlining special procedures that preempt the regular H-2A regulations contained in 20 C.F.R. part 655); *id.* ("The Department is continuing a special variance to the offered wage rate requirements contained at 20 CFR 655.120(a)."); TEGL No. 32-10, 76 Fed. Reg. 47,256, 47,257 (Aug. 4, 2011) (same). Under the general H-2A regulations, employers wishing to hire foreign laborers would be required to pay herders the Adverse Effect Wage Rate, which in 2011 ranged from $8.97 per hour to $12.01 per hour, depending on the state. 2011 Adverse Effect Wage Rates, 76 Fed. Reg. 11,286, 11,286 (Mar. 1, 2011). Under the special procedures set forth in the TEGLs, however, employers need only pay herders the prevailing wage rate, which in 2011 was $875 per month plus room and board for cattleherders and from $750 to $1,422.52 per month plus room and board for sheepherders and goatherders, depending on the state. *See Agricultural Online Wage Library*, U.S. DEP'T LABOR, EMP. & TRAINING ADMIN., http://www.foreignlaborcert.doleta.gov/aowl.cfm (last visited June 3, 2014). A sheepherder in Colorado paid the prevailing

wage and working a 40-hour week would make less than $4.69 per hour plus room and board—well below the $10.48 AEWR in Colorado.[4] The TEGLs also permit lower standards for herder housing than the general H-2A regulations authorize for employer-provided housing to other agricultural workers. *Compare, e.g.*, 20 C.F.R. § 655.122(d) (housing provided by H-2A employers generally must meet OSHA standards set forth at 29 C.F.R. § 1910.142), *and* 29 C.F.R. § 1910.142(b) (sleeping rooms must have at least 50 square feet of floor space per occupant and seven-foot ceilings; living quarters must include windows "the total of which may not be less than one-tenth of the floor area"; wood floors must be elevated at least one foot above ground level to prevent dampness), *with* TEGL No. 15-06, 76 Fed. Reg. at 47,246–47 (lacking similar requirements for housing provided to open-range herders), *and* TEGL No. 32-10, 76 Fed. Reg. at 47,261–62 (same regarding sheepherders and goatherders).

---

[4] Of course, sheepherders are actually on call twenty-four hours per day, seven days per week. TEGL No. 32-10, 76 Fed. Reg. at 47,259. Even after accounting for room and board, herders making the prevailing wage earn far less than other agricultural workers being paid the AEWR. Although not all employers are required to provide their agricultural workers room and board under the H-2A program, employers are required to provide housing at no cost if the workers are not reasonably able to return to their residence within the same day—as would ordinarily be the case for herders who often work far from their home and may need to be on call to tend to livestock at all hours. 20 C.F.R. § 655.122 (d). The general H-2A regulations require employers to provide their employees either kitchen facilities to enable the workers to prepare their own meals, or three meals a day. 20 C.F.R. § 655.122(g). If an employer chooses to provide its workers with meals, it may charge its workers $10.73 per day for the meals. 20 C.F.R. § 655.173(a); 76 Fed. Reg. 11,286, 11,287 (Mar. 1, 2011).

The 2011 TEGLs also differ in significant and adverse ways from the prior special procedures governing herding employers. *See infra* Part III. Thus, the TEGLs adversely affect herders by lowering wages and worsening working conditions, whether they are compared to the alternative of eliminating special procedures for herders altogether or retaining the pre-2011 special procedures.[5]

It does not matter if defendants are correct in suggesting the TEGLs comply with the INA's requirement that use of foreign labor not adversely affect American workers' wages and working conditions. We may ignore the merits of the TEGLs' guidance. Plaintiffs asserting a procedural rights challenge need not show the agency action would have been different had it been consummated in a procedurally valid manner—the courts will assume this portion of the causal link. *Ctr. for Law & Educ.*, 396 F.3d at 1160. Rather, plaintiffs simply need to show the agency action affects their concrete interests in a personal way. In other words, the intervenors' argument that the agency action was lawful or correct on the merits—and therefore that it did not injure the plaintiffs—is substantially the same as arguing the omitted procedure would not have affected the agency's decision. This is precisely the argument a defendant *cannot* make in a procedural rights challenge. *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)

---

[5] The intervenors point to a list of available jobs they claim pay significantly higher wages than required under the standards contained in the 2011 TEGLs. *See* J.A. 58–60. But even if there are job opportunities for herders that pay above the minimum wage required by the TEGLs, that says nothing about the working conditions of those jobs. Moreover, it gives no indication of *what the offered wage rate might be* if it were not for the Department's allegedly lax guidelines for the admission of foreign labor.

("The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff. To insist upon the former rather than the latter as part of the standing inquiry . . . is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with a[] [discharge] permit.").

Having concluded individuals competing in the herder labor market have standing to challenge the TEGLs, we need only determine whether any of the plaintiffs in this action is a member of that market. A party seeking to establish standing on the basis of the competitor standing doctrine "must demonstrate that it is a *direct* and *current* competitor whose bottom line may be adversely affected by the challenged government action." *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004). The district court concluded "none of [the plaintiffs] has been a competitor in the open-range herding industry since May 2011." *Mendoza v. Solis*, 924 F. Supp. 2d 307, 319 (D.D.C. 2013). We believe the district court took too narrow a view of what qualifies as participating in the herding labor market.

The plaintiffs have averred they are experienced and qualified herders. *See* Mendoza Aff. ¶ 5, J.A. 46 (worked as a sheepherder for about 14 months); Castro Aff. ¶¶ 2, 3, J.A. 51; Catalan Aff. ¶¶ 2, 3, J.A. 55–56. They state they are interested in working as herders and herding is their preferred occupation. *See* Mendoza Aff. ¶¶ 9, 10, J.A. 47 ("Herding is my preferred occupation. In the city I get board [sic] when I am not working and I miss working with animals."); Castro Aff. ¶¶ 7, 9, J.A. 52; Catalan Aff. ¶¶ 8, 9, J.A. 56–57. Although the plaintiffs have not averred they have applied for specific herding jobs since the 2011 TEGLs went into effect, their affidavits suggest they have monitored the labor market

for acceptable positions. *See* Castro Aff. ¶ 8, J.A. 52 ("After leaving the ranch, I did find out about another job as a sheepherder in Washington. But after talking to one of the former workers, I found out that the conditions were the same as the ranch I left, so I did not pursue the job."); Catalan Aff. ¶ 10, J.A. 57 ("I have met sheepherders here in Washington and they have the same bad conditions that I had when I worked as an H-2A herder with cattle. . . ."). At least one of the plaintiffs, Mendoza, has been repeatedly offered a job as a herder, which he declined due to the poor wages and working conditions. Mendoza Aff. ¶ 13, J.A. 48 ("My employer from Henefer, UT calls me every once in a while to ask if I will return to work for him but he doesn't offer better pay so I don't take his offer.").

Even though the plaintiffs have not worked as herders since 2011 and may not have applied for specific herder jobs since that time, they have affirmed their desire to work as herders and stated their intention to do so if wages and working conditions improve. *See* Mendoza Aff. ¶ 10, J.A. 47 ("I want to work as a herder again."); *id.* ¶ 11, J.A. 47 ("I would be willing to work as a herder if the employer paid . . . ."); Castro Aff. ¶¶ 7, 9, J.A. 52; Catalan Aff. ¶¶ 8, 9, J.A. 56–57 ("I would take an open range herding job."). The plaintiffs are not removed from the herder labor market simply because they do not currently work as herders and have not filled out formal job applications. A person can involve himself in a job market by means other than submitting formal applications. Job searches are not such rigid processes. The plaintiffs continue to monitor the herder job market with the intention of applying for work in the industry if conditions improve. Mendoza, in particular, has demonstrated a substantial likelihood he would be able to find a job as a herder since he has been repeatedly offered jobs by a former employer. The plaintiffs' affidavits thus

demonstrate their informal involvement in the labor market. And because the plaintiffs retained ties to the industry, it was reasonable for them to conclude that formally applying for jobs would be futile when they would not accept a job offering the prevailing wage and working conditions. *See* Castro Aff. ¶ 8, J.A. 52 (stating he found out about a sheepherder position in Washington but did not pursue the job after finding out the conditions were the same as the ranch he had previously left).

The standing inquiry here is similar to that in *Friends of the Earth*. In that case, an environmental group asserted standing to sue under the Clean Water Act a company allegedly discharging pollutants into the North Tyger River. *Friends of the Earth, Inc.*, 528 U.S. at 175–79. The Supreme Court held members of the plaintiff organizations had demonstrated sufficient injury to establish standing. *Id.* at 180–86. One of the plaintiffs' members had averred "he would like to fish, camp, swim, and picnic in and near the river . . . as he did when he was a teenager, but would not do so because he was concerned that the water was polluted by Laidlaw's discharges." *Id.* at 181–82. Other members stated they used to picnic, camp, hike, birdwatch, boat, and wade along the river but they no longer engaged in these activities because of concern about harmful effects from discharged pollutants. *Id.* at 182–83. The Court held these sworn statements adequately documented injury in fact. *Id.* at 183.

Like the affidavits discussed in *Friends of the Earth*, the plaintiffs' affidavits regarding their interest in working as herders present more than "general averments" and "conclusory allegations." *Id.* at 184. The plaintiffs have attested to specific experience that qualifies them to work as herders; the particular working conditions that led them to leave the industry; the specific wages and conditions they

would require to accept new employment as workers; the manner in which they have kept abreast of conditions in the industry; and, at least with regard to Mendoza, a specific possible avenue for obtaining reemployment as a herder.[6]

Finally with regard to plaintiffs' constitutional standing, the intervenors argue the plaintiffs do not have standing because their injury was not caused by the 2011 TEGLs, but by policies that pre-existed those guidelines. But the fact that previous policies may have caused the plaintiffs similar harm does not mean the 2011 TEGLs do not cause the plaintiffs injury in fact. *Transportation Workers Union of America, AFL-CIO v. Transportation Security Administration*, 492 F.3d

---

[6] The plaintiffs do not need to apply for and be offered positions they have a reasonable basis for knowing will provide substandard compensation and conditions just to maintain standing to bring this suit. To create such a standard would require plaintiffs "to engage in a futile act." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1102 (D.C. Cir. 2005) (holding plaintiff had standing to challenge a Parole Commission rule preventing him from having a representative at his parole hearing despite the fact he had not obtained a representative who would have been ready and able to appear on his behalf). The plaintiffs' members in *Friends of the Earth* had standing even though they did not continue to hike, swim, and boat along the North Tyger River despite the pollution. *See Friends of the Earth, Inc.*, 528 U.S. at 182–83 (holding members wished to engage in recreational activities but *refrained from doing so* because of the pollution). *Cf. Sporhase v. Neb. ex rel. Douglas*, 458 U.S. 941, 944 & n.2 (1982) (holding appellants had standing to challenge Nebraska law requiring them to obtain permit before transferring water across the state border even though they had never applied for a permit because, under the challenged law, the permit would not have been granted). We do not generally require plaintiffs to engage in a futile act to prove the sincerity of their injury.

471 (D.C. Cir. 2007)—the case on which the intervenors rely for this argument—is inapposite. In *Transportation Workers Union*, we considered a procedural challenge to TSA's Legal Guidance defining the term "conviction." *Id.* at 472. Employees "convicted" of listed crimes were prohibited from working in sensitive areas of an airport. *Id.* at 473. In 2003, TSA published a Legal Guidance defining the term, and in 2004 the agency updated the guidance, making slight changes. *Id.* After a union worker was suspended from his job, the union filed an action challenging the issuance of the 2004 Guidance—specifically, the procedural wrong of switching from the 2003 to the 2004 guidance without notice and comment. *Id.* at 474–75. The plaintiff conceded the 2003 Guidance was properly issued, and we determined the worker would have been ineligible for his job under either the 2003 or 2004 guidance. *Id.* at 475–77. Therefore, we held the union lacked standing because of "the *particular* claim" it advanced—the union was challenging the *change* from the 2003 to 2004 guidance and this *change* did not cause the suspension. *Id.*

This case presents a different type of claim. Plaintiffs are not challenging the 2011 TEGLs on the basis that they impermissibly *changed* a valid previous policy. Rather, plaintiffs are arguing the 2011 TEGLs, like all prior Department of Labor guidance on the matter, were implemented without the required notice and comment procedures. In the type of case now before us, where the plaintiffs do *not* concede that prior procedures were validly promulgated, the fact that previous rules may also have caused the plaintiffs injury does not break the causal link between the rules they now challenge and the asserted injury. The only relevant inquiry is whether the 2011 TEGLs cause injury—and we have concluded they do. Put another way, the Department of Labor's previous failure to comply with the

notice and comment requirements of the APA cannot excuse its later violation of those requirements, nor render the latter violation unreviewable.[7]

To conclude, we are satisfied the plaintiffs have Article III standing to challenge the Department's failure to engage in the notice and comment procedures required by the APA. Under the competitor standing doctrine, the TEGLs affect the concrete interests of individuals seeking work as herders. The plaintiffs have established they are seeking work as herders and would accept such work if provided the wages and working conditions they contend the law requires.[8]  Finally, because the plaintiffs assert a procedural violation, we can assume the causal link between that procedural violation and the substantive outcome of the agency action.[9]

---

[7] This discussion assumes the existence of the previous rules does not result in the plaintiffs' claims being barred by the statute of limitations, an issue we discuss below.

[8] Because we find the plaintiffs are willing and available to work as herders, we need not consider plaintiffs' alternative argument that plaintiff Catalan has standing because the wages he receives in his current job as a ranch hand are depressed by the influx of foreign herders.

[9] Having concluded plaintiffs sufficiently demonstrated standing under the standards applicable at the motion to dismiss stage, we have no trouble concluding they also meet their burden under the applicable standard at the summary judgment stage. *See Lujan*, 504 U.S. at 561 (plaintiff must establish the elements of standing in a different manner depending on the stage of litigation). The relevant facts—including, for instance, plaintiffs' experience working as open-range herders and that Mendoza has received job offers to return to herding—are undisputed. Rather, defendants challenge the sufficiency of those facts to meet the *legal* standard for injury in fact, causation, and redressability. The standard for resolution of

## III

Our conclusion that the plaintiffs meet the constitutional requirements for standing does not end our discussion of the plaintiffs' right to pursue this action. We must also inquire whether the plaintiffs fall within the class of persons whom Congress has authorized to sue under the Administrative Procedure Act. To do so, we ask whether "a plaintiff's grievance . . . arguably fall[s] within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett v. Spear*, 520 U.S. 154, 162 (1997). Following the lead of the Supreme Court, *see, e.g.*, *id.* at 163, we have previously referred to this requirement as one of "prudential standing"—and so the district court did in its opinion. Recently, however, the Supreme Court has clarified that "'prudential standing' is a misnomer" because the zone-of-interests analysis does not rest on prudential considerations, but rather asks the statutory question of whether "a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc.*, 134 S. Ct. at 1386–88 (quoting *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675–76 (D.C. Cir. 2013) (Silberman, J., concurring)).[10]

these legal arguments is the same at the motion to dismiss stage as it is on a motion for summary judgment. Furthermore, as is evident from our discussion, both we and the district court have considered relevant facts found outside of the complaint, as we are permitted to do on a Rule 12(b)(1) motion to dismiss for lack of jurisdiction. *Coal. For Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

[10] *Lexmark International* was decided subsequent to oral argument in this case. Because it calls for us to reframe what the district court described as a "prudential standing" inquiry, the case would

Although the plaintiffs here assert a cause of action under the APA, in considering whether plaintiffs are authorized to sue under that law we look to whether they fall within the zone of interests sought to be protected by the substantive statute pursuant to which the Department of Labor acted: the INA. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345–48 (1984). Nevertheless, we apply the zone-of-interests test in a manner consistent with "Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012). "We do not require any indication of congressional purpose to benefit the would-be plaintiff." *Id.* Rather, a plaintiff falls outside the group to whom Congress granted a cause of action only when its interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). The zone-of-interests test is not a demanding one. *Id.*

The interests protected by the relevant provision of the Immigration and Nationality Act are plain. The INA requires a petition to admit aliens as H-2A workers only be approved if the petitioner has received certification from the Secretary of Labor that:

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and

have been the proper subject of a letter from the parties pursuant to Federal Rule of Appellate Procedure 28(j). We urge counsel to diligently keep us apprised of relevant legal developments that occur even after oral argument.

place needed, to perform the labor or services involved in the petition, and

(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1). The clear intent of this provision is to protect American workers from the deleterious effects the employment of foreign labor might have on domestic wages and working conditions. In particular, Congress was concerned about (1) the American workers who would otherwise perform the labor that might be given to foreign workers, and (2) American workers in similar employment whose wages and working conditions could be adversely affected by the employment of foreign laborers. *See Int'l Union of Bricklayers & Allied Craftsmen*, 761 F.2d at 804–05 ("The legislative history of [the INA] (as initially passed) clearly evinces a congressional purpose to keep American labor stalwart in the face of foreign competition in the United States . . . ."); *Int'l Longshoremen's & Warehousemen's Union*, 891 F.2d at 1379 ("A primary purpose of the immigration laws, with their quotas and certification procedures, is to protect American laborers.").

The district court found the plaintiffs did not fall within the zone of interests of the Immigration and Nationality Act for the same reasons it found the plaintiffs lacked Article III standing—the plaintiffs were not willing and available to work as herders. But for the same reasons we hold the plaintiffs *have* established Article III standing, we also hold they *do* fall within the zone of interests of the INA—the plaintiffs are American workers who would work as herders. They allege the Department of Labor's lax certification

standards for H-2A visas for herders make it more difficult for them to find herding jobs with decent wages and working conditions. The plaintiffs' interests are squarely "within the zone of interests protected . . . by the statutory provision . . . invoked in the suit." *Bennett*, 520 U.S. at 162.

The district court held that because the plaintiffs were unwilling to work at current herder wages they are not "willing" and "available" workers within the meaning of 8 U.S.C. § 1188(a)(1)(A). *See Mendoza*, 924 F. Supp. 2d at 322–23. But such a standard would force would-be plaintiffs to accept substandard wages and working conditions— precisely the situation the INA seeks to prevent—to prove their "willingness" and "availability," and to establish themselves as within the Act's zone of interests. This cannot be the result Congress intended. *See* 20 C.F.R. § 655.0(a)(2) ("U.S. workers cannot be expected to accept employment under conditions below the established minimum levels."); *id.* ("Before any factual determination can be made concerning the availability of U.S. workers to perform particular job opportunities . . . the minimum level of wages . . . and conditions for the particular job opportunities, below which similarly employed U.S. workers would be adversely affected, must be established."). Rather, workers displaced by lax visa policies from jobs they otherwise would hold fall within the class of individuals whom the INA seeks to protect. For the reasons explained above, the plaintiffs' affidavits establish they are "able, willing, . . . qualified, and . . . available" to work as herders. 8 U.S.C. § 1188(a)(1)(A). The plaintiffs fall within the zone of interests of the INA and have a legislatively conferred cause of action to raise their claim regarding the Department of Labor's administration of the H-2A program as it regards herders.

24

IV

Although we have concluded the plaintiffs have Article III standing and statutory authorization to raise their claims, we cannot yet proceed to the merits of this case. Subject matter jurisdiction cannot be waived and federal courts have "an independent obligation to assure [them]selves of jurisdiction, even where the parties fail to challenge it." *Floyd v. District of Columbia*, 129 F.3d 152, 155 (D.C. Cir. 1997). After oral argument, we asked the parties to submit supplemental briefing on the question of whether the plaintiffs' claims are barred by the statute of limitations. We conclude they are not.

Unless another statute provides otherwise, civil claims against the United States—including those brought pursuant to the APA—are subject to the statute of limitations contained in 28 U.S.C. § 2401, which allows for civil actions against the United States so long as "the complaint is filed within six years after the right of action first accrues." *See Harris v. FAA*, 353 F.3d 1006, 1009 (D.C. Cir. 2004). Congress has not adopted a special statute of limitations for the type of claim the plaintiffs bring, so § 2401(a) is relevant here. Although the defendants had not asserted the statute of limitations defense until our request for supplemental briefing, the statute of limitations contained in § 2401(a) is not subject to waiver like the normal statute of limitations affirmative defense is. We have long held § 2401(a) "creates a jurisdictional condition attached to the government's waiver of sovereign immunity." *P & V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1026 (D.C. Cir. 2008).[11] A

---

[11] We have recently questioned the continuing viability of this holding in light of recent Supreme Court decisions. *See P & V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1027 & n.2

jurisdictional statute of limitations cannot be waived by the parties. We must determine when the plaintiffs' right of action first accrued.

The APA makes reviewable "final agency action." 5 U.S.C. § 704. A final agency action is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett*, 520 U.S. at 178. Because an agency's renewal of an earlier decision does not alter the status quo, it does not restart the statute of limitations. *See Impro Prods., Inc. v. Block*, 722 F.2d 845, 850 & n.9 (D.C. Cir. 1983) (holding agency's renewal of earlier decision— periodic redistribution of reprints of articles allegedly containing false information—did not restart statute of limitations). Therefore, we must determine whether the 2011 TEGLs or their predecessors enacted a substantive change that restarted the statute of limitations clock within the six years prior to October 7, 2011 when the complaint was filed.[12]

---

(D.C. Cir. 2008); *Felter v. Kempthorne*, 473 F.3d 1255, 1260 (D.C. Cir. 2007); *Harris*, 353 F.3d at 1013 n.7. However, because we hold the plaintiffs filed this action within six years from the date their claims accrued, we need not resolve this issue now.

[12] Alternatively, the reopener doctrine permits a plaintiff to bring an otherwise-stale challenge where the agency "has undertaken a serious, substantive reconsideration of the existing rule." *P & V Enters.*, 516 F.3d at 1023–24. The reopener doctrine is employed when an agency has considered substantively changing a rule but ultimately *declined* to do so. We do not employ the doctrine here because we find there was new agency action substantively changing the special procedures within the six years prior to the filing of the complaint.

The policies contained in the 2011 TEGLs the plaintiffs challenge were substantively changed in the six years prior to the filing of the complaint. Although there had long existed special procedures for handling H-2A visas for sheepherders and goatherders, similar special procedures were only implemented for open-range (cattle) herders in 2007. *See* Foreign Labor Certification; Training and Employment Guidance Letter No. 15-06, at 1 (Feb. 9, 2007), *available at* http://wdr.doleta.gov/directives/attach/TEGL/TEGL15-06.pdf ("*establish*[*ing*] special procedures as part of the H-2A labor certification process for employers who desire to employ temporary foreign workers in the United States for occupations involved in the open range production of livestock" (emphasis added)). The 2007 TEGL No. 15-06 had significant legal consequences for open-range herders and their employers. We need not decide whether the 2011 TEGL No. 15-06 substantively altered the policies of the 2007 TEGL because the plaintiffs' 2011 challenge to the agency action—whether concluded in 2007 or 2011—was brought within the six-year statute of limitations.

The special procedures for H-2A certification for sheepherders have a longer lineage. The 2011 TEGL No. 32-10 rescinds and replaces procedures contained in the 2001 Field Memorandum No. 24-01.[13] Because the period for challenges to the 2001 Field Memorandum has long passed, we examine whether the 2011 sheepherder TEGL substantively altered the 2001 policies, and thus constituted final agency action sparking a new period for review.

---

[13] The 2001 Field Memorandum itself rescinded and replaced procedures set out in a 1989 Field Memorandum.

We conclude the 2011 TEGL contains substantive changes to the 2001 procedures. Most notably, the 2001 Field Memorandum required employers to offer sheepherders the highest of the prevailing wage rate, a special monthly AEWR set by the Department of Labor, or the legal minimum wage rate. *See* Field Memorandum No. 24-01, Special Procedures: Labor Certification for Sheepherders and Goatherders Under the H-2A Program (Aug. 1, 2001), *available at* http://www.foreignlaborcert.doleta.gov/fm/fm_24-01.htm ("2001 Field Memorandum"); Special Procedures attached to 2001 Field Memorandum 3, *available at* http://www.foreignlaborcert.doleta.gov/fm/fm_24-01a.pdf ("2001 Special Procedures"). The 2011 TEGL removes the option for the Department to establish a special monthly AEWR, thus allowing employers to pay the higher of only the prevailing wage rate or the legal minimum wage rate. TEGL No. 32-10, 76 Fed. Reg. at 47,257–58. As another example, the 2011 TEGL exempts individual employers and employer associations from the requirement—which is generally applicable to other H-2A employers, *see* 20 C.F.R. § 655.151, and which was applicable to herding associations under the 2001 Field Memorandum, *see* 2001 Special Procedures 8–9— of placing job advertisements in newspapers. TEGL No. 32-10, 76 Fed. Reg. at 47,260.

The numerous alterations to the H-2A visa process and minimum standards for sheepherders, at least in the aggregate, are substantive changes constituting new agency action. The 2011 TEGLs altered the wages and working conditions H-2A employers are required to offer American sheepherders, as well as the availability of such jobs. Furthermore, the contents of the sheepherder TEGL must stand or fall together; they outline a single compensation package and set of procedures to protect American workers. We cannot separate policies untouched by the 2011 update from those

substantially altered by the TEGL. *Cf. MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) ("Whether the offending portion of a regulation is severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision.").

Because the open-range herder TEGL reflects special procedures first introduced within the statute of limitations, and because the sheepherder and goatherder TEGL substantively alters the procedures previously in place, both TEGLs are the product of final agency action. The TEGLs meaningfully altered the rights and obligations of herders and their employers. *See Bennett*, 520 U.S. at 178. The plaintiffs properly filed their claims within six years of the final agency action. The claims are not barred by the statute of limitations.

V

Having concluded we have jurisdiction to hear this action, we can finally turn to the merits of the plaintiffs' claim. We do this even though the district court, dismissing the action for lack of jurisdiction, never reached the merits. Although our general practice in such a case is to remand to the district court, we think it appropriate to resolve the issue now. *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 n.4 (D.C. Cir. 2013); *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 n.* (D.C. Cir. 2012). The plaintiffs and the government fully briefed the issue before this court and requested that, if we find the plaintiffs have standing, we reach the merits of plaintiffs' claims. We have considered the full briefing the intervenors submitted to the district court regarding the motions for summary judgment. The district court has no comparative advantage in reviewing the agency action for compliance with the notice and comment

requirements. An appeal from any district court decision after remand is likely, and our review of the district court's decision would be de novo. *See Roberts v. United States*, 741 F.3d 152, 157–58 (D.C. Cir. 2014) ("We review the district court's grant of summary judgment de novo, which is to say we review the administrative action directly, according no particular deference to the judgment of the District Court."). As even the intervenors—who ask us to remand to the district court—acknowledge, the merits of the plaintiffs' claim involve purely legal questions. Def.-Intervenors' Mem. Supp. Mot. Summ. J., *Mendoza v. Solis*, ECF No. 29-2, No. 1:11-cv-1790 (D.D.C.). Moreover, the merits of this case are clear. A remand to the district court would be a waste of judicial resources.

An agency is generally required by the APA to publish notice of proposed rulemaking in the Federal Register and to accept and consider public comments on its proposal. 5 U.S.C. § 553. The APA exempts from these procedural requirements: (1) interpretative rules; (2) general statements of policy; and (3) rules of agency organization, procedure, or practice. *Id.*[14] This court has generally referred to the category of rules to which the notice and comment requirements do apply as "legislative rules" or, sometimes, "substantive rules." *Cent. Tex. Tel. Co-op, Inc. v. FCC*, 402 F.3d 205, 210 (D.C. Cir. 2005); *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34 (D.C. Cir. 2005).

---

[14] Defendants do not argue the TEGLs constitute general statements of policy, so we do not address this exemption.

A

The defendants argue the TEGLs are interpretative rules exempt from notice and comment procedures. "An 'interpretative rule' describes the agency's view of the meaning of an existing statute or regulation." *Batterton v. Marshall*, 648 F.2d 694, 702 n.34 (D.C. Cir. 1980). The court's inquiry in distinguishing legislative rules from interpretative rules "is whether the new rule effects a substantive regulatory change to the statutory or regulatory regime." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.* (*EPIC*), 653 F.3d 1, 6–7 (D.C. Cir. 2011). Interpretative rules are those that clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or "merely track[]" preexisting requirements and explain something the statute or regulation already required. *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 236–37 (D.C. Cir. 1992). To be interpretative, a rule "must derive a proposition from an existing document whose meaning compels or logically justifies the proposition." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010).

A legislative rule, on the other hand, "is one that does more than simply clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a consistent agency policy." *Nat'l Family Planning & Reprod. Health Ass'n, Inc.*, 979 F.2d at 237. A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy. *Id.*; *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995).

The defendants point to four statutory and regulatory provisions the TEGLs purportedly interpret. First, the

defendants argue the TEGLs are interpretations of the Department's mandate, found at 8 U.S.C. § 1188(a)(1), to certify the admission of H-2A workers only if there are not sufficient American workers and if admitting the foreign workers would not adversely affect the wages and working conditions of American workers similarly employed. According to the defendants, the TEGLs interpret this statutory requirement by providing guidelines to determine whether there are sufficient American workers for herding occupations. If the defendants are correct, it is difficult to imagine what regulations *would* require notice and comment procedures. Section 1188(a)(1) establishes the INA's general mission; Congress left it to the Department of Labor to implement that mission through the creation of specific substantive provisions. To take just one example, the statute does not provide adequate guidance with regard to how an employer must attempt to recruit American workers before it can obtain certification that there is a shortage of American workers—an issue the TEGLs clarify in some detail. The statute explicitly envisions implementing regulations that will clarify the meaning and application of its provisions. *See* 8 U.S.C. §§ 1188(b)(1), (c)(3)(B)(i), (c)(3)(B)(iii), (c)(4); *cf. AFL-CIO v. Brock*, 835 F.2d 912, 914 (D.C. Cir. 1987) ("[T]he [statute] does not define 'adverse effect.' Nor does the Act specify how adverse effect is to be measured. The Department is entrusted with these tasks."). The TEGLs do more than clarify or remind parties of preexisting duties under § 1188. Rather, they supplement the statute by imposing specific duties on employers seeking certification under the statute. *Cf. EPIC*, 653 F.3d at 7 (agency's formulation of strict and specific obligations to implement a broad statutory command—"to detect weapons"—was not an interpretative rule).[15]

---

[15] If the TEGLs and general H-2A regulations were both merely

Second, the Department of Labor argues the TEGLs interpret the statutory directive "[t]hat the Secretary of Labor shall issue regulations which address the specific requirements of housing for employees principally engaged in the range production of livestock." 8 U.S.C. § 1188(c)(4). But rather than setting out a substantive standard the TEGLs might interpret, the statute delegates authority for the Secretary of Labor to create the substantive standard. Where Congress has specifically declined to create a standard, the Department cannot claim its implementing rule is an interpretation of the statute. As the Seventh Circuit has stated, a binding rule promulgated pursuant to a delegation of legislative authority is "the clearest possible example of a legislative rule, as to which the notice and comment procedure not followed here is mandatory, as distinct from an interpretive rule; for there [is] nothing to interpret." *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 169–70 (7th Cir. 1996).

Third, the intervenors argue the TEGLs interpret 20 C.F.R. § 655.102, which grants the Office of Foreign Labor Certification Administrator the authority to establish special procedures for processing certain H-2A applications—including those for herders. This argument fails for the same reason the previous argument fails. In issuing the TEGLs, the Department cannot possibly be interpreting a grant of unconstrained and undefined authority. *See EPIC*, 653 F.3d at 7 ("[T]he purpose of the APA would be disserved if an agency with a broad statutory command . . . could avoid notice-and-comment rulemaking simply by promulgating a

interpreting the same language of § 1188, it is difficult to imagine how those rules could produce such different schemes, for instance with regard to whether employers must offer workers an Adverse Effect Wage Rate.

comparably broad regulation . . . and then invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations."). Furthermore, § 655.102 states the Administrator may establish an AEWR for herding occupations. It would be preposterous for the defendants to argue the Department's decision *not* to establish an AEWR for herders is only an interpretation of a provision granting it the authority to establish such a wage rate.

Fourth, the Department argues that, in setting wage requirements for H-2A employers, the TEGLs interpret the term "offered wage rate" found in 20 C.F.R. § 655.120. Section 655.120—which is titled "Offered wage rate"— requires employers to offer and pay workers "a wage that is the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage, except where a special procedure is approved for an occupation or specific class of agricultural employment." The TEGLs cannot be interpreting the "offered wage rate" as defined in 20 C.F.R. § 655.120 because they ignore that regulation's general rule and, instead, take advantage of its standardless exception. In fact, the TEGLs state they "continu[e] a special variance to the offered wage rate requirements contained at 20 CFR 655.120(a)." TEGL No. 15-06, 76 Fed. Reg. at 47,244; TEGL No. 32-10, 76 Fed. Reg. at 47,257. The Department cannot claim to be interpreting the very regulatory provision from which its own rules declare it departs. *Cf. United States v. Picciotto*, 875 F.2d 345, 313–14 (D.C. Cir. 1989) ("In essence, the Park Service is claiming that an agency can grant itself a valid exemption to the APA for all future regulations, and be free of APA's troublesome rulemaking procedures forever after, simply by announcing its independence in a general rule. That is not the law. Such agency-generated exemptions

would frustrate Congress' underlying policy in enacting the APA by rendering compliance optional.").

The defendants cannot successfully point to any statute or regulation that creates substantive standards the TEGLs interpret. Rather than interpreting an existing statute or regulation, the TEGLs "endeavor[] to implement the statute, the effect of a legislative rule." *Chamber of Commerce of U.S. v. OSHA*, 636 F.2d 464, 469 (D.C. Cir. 1980). They "provide[] the policy decision Congress omitted" in § 1188—namely, how to ensure the admission of foreign herders does not adversely affect American workers. *Id.*

B

The Department of Labor alternatively argues the TEGLs are exempt from notice and comment procedures because they are "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b). "Procedural rules," the general label for rules falling under this exemption, are "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Batterton*, 648 F.2d at 702 n.34. Congress provided this exemption from the normal rulemaking procedures "to ensure that agencies retain latitude in organizing their internal operations." *Id.* at 707. Procedural rules "do not themselves alter the rights or interests of parties, although [they] may alter the manner in which the parties present themselves or their viewpoints to the agency." *Id.* "[T]he distinction between substantive and procedural rules is one of degree depending upon whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA." *EPIC*, 653 F.3d at 5–6. Those policies are "to serve the need for public participation in agency decisionmaking

and to ensure the agency has all pertinent information before it when making a decision." *Id.* at 6. The exception for procedural rules is narrowly construed, *id.*, and cannot be applied "where the agency action trenches on substantial private rights and interests," *Batterton*, 648 F.2d at 708.

Our decision in *EPIC* is instructive. In that case, this court confronted a Transportation Security Administration decision to screen airline passengers using advanced imaging technology rather than magnetometers. *EPIC*, 653 F.3d at 2–3. TSA, attempting to defend its adoption of the rule without notice and comment, argued the decision merely affected the procedures TSA would use in processing passengers through the checkpoint. *Id.* at 6. We stated this was an "overly abstract account of the change in procedure at the checkpoint[,] elid[ing] the privacy interests at the heart of the petitioners' concern." *Id.* Even though the checkpoint protocols might be termed "procedural," the change "substantively affect[ed] the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *Id.* Thus, we held the rule had "the hallmark of a substantive rule" and was not entitled to the APA's exception for procedural rules. *Id.*

Similarly, the TEGLs promulgated by the Department of Labor substantively affect the regulated public. Perhaps "stated at a high enough level of generality," *id.*, the TEGLs seem procedural—they set forth the agency's enforcement plan for determining employer compliance with the requirements of the INA and describe how employers seeking H-2A certification should present themselves to the agency. But a more practical account of the rules makes it clear the TEGLs create substantive requirements by, *inter alia*, setting the minimum wage an employer must offer American workers before it can obtain H-2A certification. The TEGLs do not

merely describe how the Department will evaluate H-2A applications, but they set the bar for what employers must do to obtain approval. In doing so, they substantially affect the rights and interests of both herders and employers.

The Department's attempt to compare the TEGLs to the Peer Review Organizations (PRO) Manual—which this court found to constitute a procedural rule not subject to the notice and comment requirement—in *American Hospital Ass'n v. Bowen*, 834 F.2d 1037 (D.C. Cir. 1987), is unavailing. The Manual at issue in that case set forth an enforcement plan for the Department of Health and Human Service's agents in monitoring the activities of Medicare providers. *Id.* at 1050. The regulations established areas of focus for PRO review but did not impose any new burdens on hospitals that would warrant notice and comment. *Id.* at 1050–51. But, as we noted, had HHS "inserted a new standard of review" or a "presumption of invalidity" applicable to certain operations, "its measures would surely require notice and comment, as well as close scrutiny to insure that it was consistent with the agency's statutory mandate." *Id.* at 1051.

The TEGLs at issue here are nothing like the Peer Review Organizations Manual we examined in *American Hospital Ass'n*. The TEGLs do not merely instruct Department of Labor agents to give extra scrutiny to H-2A applications from herder operations. Rather, they *alter the standards* imposed on herding employers seeking H-2A certification. They are not procedural, but substantive rules.

C

Beyond our conclusion that the TEGLs do not fall within the APA's exceptions, we are convinced the TEGLs were subject to the notice and comment requirements because they

possess all the hallmarks of a legislative rule. The TEGLs are necessarily legislative rules because they "effect[] a [substantive] change in existing law or policy," *Nat'l Family Planning & Reprod. Health Ass'n, Inc.*, 979 F.2d at 237, and "effectively amend[] a prior legislative rule," *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).[16] In the absence of the TEGLs, petitions for certification of H-2A herders would be subject to the standards found in 20 C.F.R. part 655, which would, to take only a few examples, require employers to pay herders the higher of the AEWR, the prevailing wage, or the minimum wage, keep track of herders' hours, and pay herders at least twice a month. The TEGLs, on the other hand, require employers to pay only the higher of the prevailing wage rate or minimum wage, exempt employers from recording herders' hours actually worked, and allow employers to pay employees once monthly upon mutual agreement between employer and worker. TEGL No. 15-06, 76 Fed. Reg. at 47,244–46; TEGL No. 32-10, 76 Fed. Reg. at 47,257–59. Because the TEGLs change the regulatory scheme for herding operations, they are legislative rules. *Cf. City of Idaho Falls v. FERC*, 629 F.3d 222, 227 (D.C. Cir. 2011). The APA required the Department of Labor to give the public notice and an opportunity to comment before it promulgated the TEGLs.

\* \* \*

---

[16] The intervenors, citing prior TEGLs and Field Memoranda, argue the 2011 TEGLs restate the Department's consistent practice regarding herders. But in deciding whether a rule is interpretative, we do not look to whether it interprets or restates prior rules similarly published without notice and comment. Rather, we look to whether the TEGLs interpret *legislative* documents—statutes passed by Congress or regulations promulgated pursuant to the procedural requirements of the APA.

The plaintiffs have asked us to remand to the district court to craft a remedy to the APA violation. The district court will have to consider various factors including whether vacating the TEGLs would have a disruptive effect on the herding industry and how quickly the Department of Labor might be able to promulgate, pursuant to the procedural requirements of the APA, new H-2A regulations for herding operations. *Cf. EPIC*, 653 F.3d at 8. We leave these questions for the district court in the first instance.

The district court erred in holding the plaintiffs lack both Article III and prudential standing to bring this action. As participants in the labor market for herders, the plaintiffs were injured by the Department of Labor's promulgation of the TEGLs and fall within the zone of interests protected by the INA. On the merits of their claim, the plaintiffs are entitled to entry of summary judgment in their favor. The TEGLs are legislative rules and the Department of Labor violated the Administrative Procedure Act by promulgating them without providing public notice and an opportunity for comment. We reverse the judgment of the district court and remand for proceedings consistent with this opinion.

*So ordered.*