# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 11, 2018          Decided August 17, 2018

No. 17-5202

HISPANIC AFFAIRS PROJECT, ET AL.,
APPELLANTS

v.

R. ALEXANDER ACOSTA, IN HIS OFFICIAL CAPACITY AS UNITED
STATES SECRETARY OF LABOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01562)

*Dermot Lynch* argued the cause for appellants. With him on the briefs was *William W. Taylor, III*.

*Heather Sokolower*, Trial Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was *Erez Reuveni*, Assistant Director.

*Christopher J. Schulte* was on the brief for intervenors aligned with defendants-appellees, Western Range Association and Mountain Plains Agricultural Service.

Before: GARLAND, *Chief Judge*, and SRINIVASAN and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:  For all the pastoral images it may invoke, tending to a flock is no easy task.  Livestock herders often spend months at a time living in makeshift campsites on a remote range, on call twenty-four hours a day to protect the herd.  Given the spartan and isolated working conditions, the sheep and goat industries have become almost wholly dependent on foreign labor to work as herders.  Many of these foreign workers come to the United States on what are known as H-2A visas, which allow nonimmigrants to enter to perform certain agricultural work.  By law, H-2A visas may issue only if the employer's need for the worker is temporary or seasonal.  But time and again, federal agencies have allowed ranchers to employ foreign herders on H-2A visas for year-round, non-seasonal work that lasts up to three years at a stretch.

The Hispanic Affairs Project, a membership organization of herders, and four individual herders challenge those agencies' 364-day certification period for H-2A visas as unmoored from the reality of herders' employment, and the agencies' allegedly persistent pattern of routinely extending "temporary" visas to meet ranchers' anything-but-temporary need for herders.  They also challenge a number of additional regulatory measures, including the minimum wage required for herders.  We hold that the challenge to the policies pertaining to the certification and automatic extension of H-2A visas can go forward, but we otherwise affirm the district court's dismissal of the plaintiffs' claims.

3

**I**

**A**

Dubbed "H-2A," Section 1101(a)(15)(H)(ii)(a) of the Immigration and Nationality Act defines qualifying "nonimmigrant[s]" as those "having a residence in a foreign country" with "no intention of abandoning [it]," and who come to the United States "to perform agricultural labor or services * * * of a *temporary or seasonal nature*." 8 U.S.C. § 1101(a)(15)(H)(ii)(a) (emphasis added). H-2A-visa holders have no independent route to apply for permanent residency or legal citizenship. Instead, they are dependent on their visa sponsors to lawfully stay in and return to the United States for work. *See* 20 C.F.R. § 656.16 (only employers can opt to apply for a permanent labor certification for herders, which can lead to residency and citizenship).

The Department of Homeland Security and the Department of Labor are jointly responsible for administering the H-2A program. To obtain an H-2A visa to bring in foreign workers, an employer must first submit to the Labor Department an Application for Temporary Employment Certification. In that Application, the employer must establish that: (i) the temporary foreign worker will "perform agricultural labor or services of a temporary or seasonal nature," 20 C.F.R. § 655.103; (ii) there are no domestic workers available that are qualified to fill the position; and (iii) hiring the foreign workers would not "adversely affect the wages and working conditions of workers in the [United States] similarly employed," *id.* § 655.100; 8 U.S.C. § 188(a)(1). If the Labor Department finds that those requirements are met, it may issue the Certification.

The torch is then passed to the Department of Homeland Security, which makes the final decision on whether or not to grant the employer's H-2A petition. 8 U.S.C § 1184(c)(1). To obtain that final approval, the H-2A petition must establish to Homeland Security's satisfaction that the proposed employment, among other things, is of a "temporary or seasonal nature," 8 C.F.R. § 214.2(h)(5)(iv)(A).[1]

Homeland Security regulations define "temporary" as "where the employer's need to fill the position with a temporary worker will, except in extraordinary circumstances, *last no longer than one year*." 8 C.F.R. § 214.2(h)(5)(iv)(A) (emphasis added). Homeland Security regulations emphasize that the Labor Department's earlier finding that the employment would be temporary is "normally," but not necessarily, "sufficient[.]" *Id.* § 214.2(h)(5)(iv)(B). Homeland Security could take exception to that prior finding if "substantial evidence" shows that "the employment is not temporary or seasonal." *Id.*

Once an H-2A visa issues, the immigrant worker can stay for the duration of the "validity of the labor certification or for a period of up to one year," but in no event can the stay "exceed three years." 8 C.F.R. § 214.2(h)(15)(ii)(C). As it turns out, in practice, most herders stay and work for just short of three years, spend three months in their home country, and then return to the United States on another H-2A visa. *See* Second

---

[1] While the Act refers to the Attorney General as the final decisionmaker on H-2A applications, the Attorney General has the power to "delegate such authority," 8 U.S.C. § 1103(g)(2), and the Department of Homeland Security is now largely responsible for "administration and enforcement" of "immigration and naturalization" matters, *id*. § 1103(a)(1), including H-2A visas, *see generally Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex. rel. Barez*, 458 U.S. 592, 595 (1982).

Amended Complaint, *Hispanic Affairs Project v. Perez*, No. 15-1562 (D.D.C. Dec. 22, 2015), ECF No. 58 at ¶ 51 ("Second Am. Compl."); J.A. 776 (ranching employer referring to herders' "three-year contracts on an H-2A visa"); J.A. 796 (another employer relating that the H-2A program permits herders to "come to the U.S. for up to 3 years and then return to their home country for a brief period of time").

**B**

To protect domestic jobs, the Department of Labor has promulgated regulations that set minimum wages and working conditions for H-2A workers and their domestic counterparts. Generally, the Labor Department requires the employers of H-2A workers to pay those workers the highest wage set by (i) the Adverse Effect Wage Rate, which is determined by Labor "to ensure that the wages of similarly employed U.S. workers will not be adversely affected[,]" 20 C.F.R. § 655.1300; (ii) "the prevailing hourly wage or piece rate; [(iii)] the agreed-upon collective bargaining wage; or [(iv)] the Federal or State minimum wage," *id.* § 655.120(a).

But employers of open-range herders, such as sheep and goat herders, are exempt from that minimum-wage requirement due to the unique characteristics of the position, which include "spending extended periods" of time "in isolated areas and being on call twenty-four hours a day, seven days a week to protect livestock." *Mendoza v. Perez*, 754 F.3d 1002, 1009 (D.C. Cir. 2014). In 2011, the Secretary issued a Training Employment Guidance Letter that formalized the exemption of herder employers from the regulation's prescribed wage rates. The 2011 Guidance Letter adopted instead a different method for calculating the prevailing wage, setting a lower floor for what employers must pay H-2A open-range herders.

In an earlier case challenging the procedural validity of the 2011 Guidance Letter, we held that the Administrative Procedure Act required that the Guidance Letter's prescriptive content be promulgated through the notice-and-comment process, 5 U.S.C. § 553. *See Mendoza*, 754 F.3d at 1008–1009, 1024–1025. The case was then remanded, and the district court ruled that the invalidated 2011 Guidance Letter could remain in effect while a new rule was properly promulgated. ORDER, *Mendoza v. Perez*, No. 11-1790 (D.D.C. Oct. 31, 2014), ECF No. 54 at 1.

The Labor Department then promulgated a new rule, through notice and comment, that took effect on November 16, 2015. 80 Fed. Reg. 62,958 (Oct. 16, 2015). The 2015 Rule laid out a number of regulations governing the employment of seasonal and temporary herders, including minimum-wage standards. *Id.* The 2015 Rule applies not only to goat and sheep herders, but also to open-range herding of other livestock, such as cattle. 80 Fed. Reg. at 62,962.

## C

The Hispanic Affairs Project is a Colorado-based non-profit advocacy organization whose members consist of both United States resident and nonimmigrant "current H-2A shepherds who have labored under the 2011 * * * and 2015 Rule, and former herders who would legally work as herders again but for the low wages earned by workers in this industry." Second Am. Compl. ¶ 4. The Project and four individual shepherds (collectively, "the Project") filed suit against the Departments of Labor and Homeland Security under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* As relevant here, the Project sought a declaratory judgment that the 2011 Training and Employment Guidance Letter was substantively invalid and challenged the agencies' practice of

automatically extending visas for up to three years as arbitrary and capricious for failure to comply with the statutory obligation to limit H-2A visas to "temporary" work. The Project also contends that the minimum wage set for herders by the 2015 Rule is unjustifiably low.[2]

The district court dismissed claims related to the already-vacated 2011 Guidance Letter for lack of standing because the plaintiffs' injuries were not redressable by a favorable decision from the court. *See Hispanic Affairs Project v. Perez*, 206 F. Supp. 3d 348, 366 (D.D.C. 2016). The district court later granted summary judgment for the agencies on the remaining claims. *See Hispanic Affairs Project v. Acosta*, 263 F. Supp. 3d 160, 207 (D.D.C. 2017). The court refused to consider the Project's argument that the agencies' authorization of "permanent" H-2A visas violates the Immigration and Nationality Act for two reasons. First, the court ruled that the Project's challenge "boil[ed] down to an attack on [Homeland Security's] H-2A regulations[,]" which was not raised in its complaint and, in any event, was outside the APA's six-year statute of limitations. *Id.* at 185. Second, the court held that the Project had failed to raise during the administrative proceedings its challenge to Labor's finding that employers' need for herders is "temporary" and so had waived the issue. *Id.* at 186–190. As for the Project's other challenges to the 2015 Rule, including to the minimum-wage rate, the district court held that the agency decisions were reasonable. *Id.* at 192–199.

---

[2] Plaintiffs initially brought their action in the District Court for the District of Colorado, but the case was transferred to the District Court for the District of Columbia as related to the *Mendoza* case. ORDER GRANTING JOINT MOTION TO TRANSFER, *Hispanic Affairs Project v. Perez*, No. 15-1785 (D. Colo. Sept. 22, 2015), ECF No. 18.

8

## II

This Court reviews *de novo* a district court's grant of summary judgment. *Clemente v. FBI*, 867 F.3d 111, 119 (D.C. Cir. 2017). Dismissals for lack of subject matter jurisdiction or failure to state a claim are likewise reviewed *de novo*. *Trudeau v. Federal Trade Comm'n*, 456 F.3d 178, 183 (D.C. Cir. 2006). Under the Administrative Procedure Act, a reviewing court "shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

Applying those standards, we hold that (i) the Project's complaint adequately raised a challenge to the Department of Homeland Security's practice of automatically extending "temporary" H-2A petitions for multiple years; (ii) the Project adequately preserved its challenge to the Department of Labor's decision in the 2015 Rule to classify herding as "temporary" employment; (iii) the 2015 Rule's minimum-wage rate for herders is not arbitrary, capricious, or unsupported by the record; and (iv) the Project lacks standing to challenge the wage rates set by the already-vacated 2011 Guidance Letter.

## III

### A

#### 1

At the heart of the Project's lawsuit is Homeland Security's alleged pattern and apparent policy of routinely extending a herder's 364-day H-2A visa so that, in practice, the temporary authorization lasts for up to three years at a time, and those prolonged periods of employment are repeated over

and over, interrupted only by the herders' brief, *pro forma* visits to their home country once every three years.

Homeland Security regulations require that H-2A visas be for "temporary" work, and they define temporary as, "except in extraordinary circumstances, last[ing] no longer than one year." 8 C.F.R. § 214.2(h)(5)(iv)(A). The only exception is that an H-2A worker "may remain longer to engage in *other* qualifying temporary agricultural employment by obtaining an extension of stay" not to exceed three years. *Id.* § 214.2(h)(5)(viii)(C) (emphasis added). Homeland Security has made no official decision that herder visas categorically present the type of "extraordinary circumstances" justifying across-the-board extensions. So that means that an H-2A herder cannot stay in the United States for more than the 364 days provided in his petition, unless he engages in "other" temporary work. *Id.*[3]

The Project contends that, in contravention of the statutory and regulatory requirements that herder visas may be used only for temporary work, Homeland Security's "policy is that visa petitions will be issued for indefinite periods, with short breaks every three years for this permanent workforce." Second Am. Compl. ¶ 51. In district court, the Project provided multiple declarations from its employees, members, and other herders, along with statements from employers, all confirming that, due to Homeland Security's policy of "continually renew[ing]" H-2A visas, herders frequently stay in their positions for much longer than the 364 days authorized by the regulation, and commonly work for up to three years at a time. *See, e.g.*, J.A.

---

[3] Visas may also be provided for "seasonal" work. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). That provision is not at issue here because Labor has decided that herding should be classified and regulated as temporary work. 80 Fed. Reg. at 63,000.

332 (interviews with H-2A shepherds reveal that "they work on a permanent basis in [the United States] pursuant to continually renewed H-2A contracts that last around three years"); J.A. 335 ("[A Worker-Advocate] h[as] met at least ninety shepherds who were working on at least their second three-year contract," and around sixty workers who "have done more than three contracts."); J.A. 343 (herder attests that, from 2006 to 2015, he completed three almost-three-year H-2A shepherd contracts with the same employer); J.A. 355 ("Most H-2A shepherds I have met in Colorado, Utah, and Wyoming complete contracts that last three years."); J.A. 359 (Announcement from H-2A Employer Western Range Association stating that H-2A shepherd contracts have a "36 month work period"); *see also* 80 Fed. Reg. at 62,999 ("Several employer comments indicate that they re-employ the same H-2A workers over the years.").[4]   As the district court found, the record evidence "indicates that H-2A shepherds * * * return many times working for the same rancher for up to twenty years."  *Hispanic Affairs Project*, 263 F. Supp. 3d at 180.

As a result, according to the Project's extensive evidence of Homeland Security's actual practice, which we take as true at this procedural juncture, both herders and their employers

---

[4] The district court struck many of the Project's declarations because they were outside of the administrative record considered by the Labor Department in promulgating its 2015 Rule.  *Hispanic Affairs Project*, 263 F. Supp. 3d at 172.  But as relevant here, the Project employs the declarations for the distinct and permissible purpose of proving that the Department of Homeland Security has a practice or policy of routinely extending H-2A visa status for three years—a policy that is alleged to contravene both the Immigration and Nationality Act and its own regulations.  *See Venetian Casino Resort, LLC. v. Equal Employment Opportunity Comm'n*, 530 F.3d 925, 930 (D.C. Cir. 2008) (permitting external evidence to determine whether an agency's challenged policy exists).

routinely operate on the expectation that herders will travel to the United States to work for just shy of three years before returning home for a brief period of time, and then returning for another nearly three-year stint. *See, e.g.*, J.A. 335; J.A. 776. There also is no evidence, from Homeland Security or otherwise, to indicate that a widespread pattern of either extraordinary circumstances or herders engaging in "other qualifying" work have underlain Homeland Security's seemingly routine and repeated extensions of visas at the end of the shepherds' 364-day certification periods.

On that evidentiary basis, the Project has plausibly shown that the agency's *de facto* policy of authorizing long-term visas is arbitrary, capricious, and contrary to law, in violation of the APA and the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, because it "[a]uthoriz[es] the creation of permanent herder jobs that are not temporary or seasonal[.]" Second Am. Compl. ¶¶ 112, 114.

The district court, however, dismissed this claim against Homeland Security because the court understood the Project to be attacking Homeland Security regulations, and then found that those regulatory challenges were neither raised in the complaint, nor timely under the APA's six-year statute of limitations. *Hispanic Affairs Project*, 263 F. Supp. 3d at 185–186.

The district court was mistaken. In this claim, the Project is not challenging Homeland Security's formal regulations. The Project takes no exception to the content of the certification and extension regulations. That is because nothing in the written regulations licenses the routinized approval of H-2A shepherd petitions and visa extensions for triple the amount of time permitted by the regulation's explicit definition of "temporary." 8 C.F.R. § 214.2(h)(5)(iv)(A); *see*

Second Am. Compl. ¶¶ 51, 112, 114. Instead, what the Project assails is Homeland Security's practice of shrugging off those statutory and regulatory limitations, seemingly ignoring their straightforward requirement that herders' work be "temporary."

The district court viewed the extension policy and practice as "intertwined" with the formal regulations. *Mendoza*, 263 F. Supp. 3d at 186. The opposite is true. If the Project were to prove its claims of routine three-year or longer employment terms, Homeland Security's policy and practice would contravene the plain text of its own regulations. *See* 8 C.F.R. § 214.2(h)(5)(iv)(A) (requiring H-2A employment to be "temporary or seasonal"); *id.* § 214.2(h)(15)(ii)(C) (recognizing that H-2A employees are typically permitted to stay for "a period of up to one year").

An agency's unannounced departure in practice from a written regulation is a distinct form of agency action that is challengeable, separate and apart from adoption of the regulation itself. *See INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) (Once an agency "announces * * * a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion' within the meaning of the [APA.]"); *see also Venetian Casino Resort, LLC. v. Equal Employment Opportunity Comm'n*, 530 F.3d 925, 930 (D.C. Cir. 2008) ("[M]aintain[ing] two irreconcilable policies, one of which * * * [allows] circumvent[ion] of the other regulation * * * is arbitrary and capricious agency action."). In other words, the Project did not need to list a specific Homeland Security regulation in its complaint as long as it made clear what policy and practice it challenged. *See* Second Am. Compl. ¶ 51. Because the Project was not

challenging a specific regulation as unlawful, the district court erred in finding that the claim was not raised in the complaint and was barred by the APA's six-year statute of limitations for challenging specific regulations.

**2**

Homeland Security offers an alternative theory to support dismissal. The agency argues that *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), closes the door on the Project's "programmatic challenge[s]" to Homeland Security's general governance and administration of the H-2A program, *id.* at 908. In *National Wildlife Federation*, a federal statute authorized the Secretary of the Interior, in declassifying public lands, "to determine whether, and for how long, the continuation of the existing withdrawals of the lands would be, in his judgment, consistent with the statutory objectives of the programs for which the lands were dedicated and of the other relevant programs." *Id.* at 877 (internal quotation marks omitted). The Wildlife Federation filed suit bringing a programmatic "challenge to all aspects of" a land withdrawal scheme, seeking to prescribe how the Secretary could and could not exercise that broad and non-specific grant of statutory authority. *Id.* at 890 n.2.

*National Wildlife Federation* is of no help to Homeland Security here. The Supreme Court stressed in *National Wildlife Federation* that, in contrast to the broad programmatic takeover advanced there, an agency's action in "applying some particular measure across the board * * * [could] of course [still] be challenged under the APA." 497 U.S. at 890 n.2. The Project is doing just that—arguing the unlawfulness of Homeland Security's "particular" practice of habitually approving and extending H-2A visas for lengthy periods of time. The statutory command that the Project seeks to

enforce—that H-2A visas be temporary and short-lived—is cabined and direct, and the Project targets its argument to an identified transgression of that statutory and regulatory language, not to an exercise of broad, unspecified discretion.

What is more, Homeland Security itself claims no broad discretionary cloak for its actions, confirming quite explicitly that if "[herders] are permanent workers then they shouldn't get approval on a temporary basis." Oral Argument Tr. 41:8–41:9. Given that acknowledgment and the Project's significant, plausible evidence, we remand to the district court to address the Project's challenge to Homeland Security's alleged pattern and practice of automatically extending H-2A visas beyond the regulatory definition of temporary employment. On remand, the district court is free to exercise its discretion to permit further discovery "to ascertain the contours of the precise policy at issue." *Venetian Casino Resort*, 530 F.3d at 928 (internal quotation mark omitted).

**B**

The Project separately sought to challenge the Labor Department's decision in the 2015 Rule to categorize herders as the type of temporary positions permitted by the H-2A visa program. In the Project's view, the regulatory scheme grants herders and their employers what is, in effect, a permanent work visa to meet a permanent and enduring need for workers. J.A. 494. More specifically, the Project argues that the Labor Department's newly promulgated regulation permitting "[t]he period of need *identified* on the H-2A Application for Temporary Employment Certification and job order for range sheep or goat herding" to be "364 calendar days," 20 C.F.R. § 655.215(b)(2) (emphasis added), is inconsistent with the Immigration and Nationality Act and Labor's own regulations. That statute requires that H-2A visas be only for "temporary"

work, 8 U.S.C. § 1101(a)(15)(H)(ii)(a), which Labor has interpreted to mean that the employer's actual "*need* to fill the position with a temporary worker * * * *last no longer* than one year," 20 C.F.R. § 655.103(d) (emphases added). Whatever a certification application may identify, employers' actual "need" for herders, the Project insists, is anything but temporary, *id*.

The district court dismissed this claim for failure to exhaust, concluding that the challenge was not sufficiently raised before the agency during the rulemaking process. We again disagree with the district court.

To preserve an objection to agency rulemaking for judicial review, courts generally require "the argument petitioner advances" to have been raised before the agency; it is not enough to have just asserted "the same general legal issue." *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) (internal quotation marks and alteration omitted). At its core, that administrative exhaustion requirement "ensure[s that] an agency has had an opportunity to consider the matter, make its ruling, and state the reasons for its action" before a court weighs in. *Oklahoma Dep't of Environmental Quality v. EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014) (internal quotation marks omitted); *see also Fertilizer Institute v. EPA*, 935 F.2d 1303, 1313 (D.C. Cir. 1991) ("[T]his exhaustion requirement is prudential and must be applied flexibly with an eye toward its underlying purposes.") (internal quotation marks omitted). Administrative exhaustion also prevents litigants from "'sandbag[ging]' agencies by withholding legal arguments for tactical reasons until they reach the court of appeals." *Oklahoma*, 740 F.3d at 192 (internal quotation marks omitted).

Exhaustion, however, is not a license for agency passivity. Agencies always bear the "affirmative burden" of

"examin[ing] a key assumption" when "promulgating and explaining a non-arbitrary, non-capricious rule." *Oklahoma*, 740 F.3d at 192. That means that an agency "must justify [a key] assumption" underlying its regulation "even if no one objects during the comment period." *Id.* (internal quotation marks omitted).

That "affirmative burden" to explain all of the "key assumption[s]" embedded in its new regulations applies with full force to Labor's rules governing herders. *Oklahoma*, 740 F.3d at 192. That is because the 2015 Rule was the first time the agency "establish[ed] standards that govern H-2A herder occupations * * * through notice and comment rulemaking[,]" 80 Fed. Reg. at 62,959, and equipped its judgments with the "force of law" that comes with notice-and-comment rulemaking, *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). Consequently, there is no prior regulatory source for the foundational elements of the rule to which one could turn.

Determining that herder work is of a temporary or seasonal nature was an indispensable prerequisite to Labor's regulation. By its terms, the H-2A visa program is confined to fulfilling employers' "temporary" or intermittent need for specific workers. 8 U.S.C. § 1101(a)(15)(H)(ii)(a) (visa program applies to workers who come to the United States "to perform agricultural labor or services * * * of a temporary or seasonal nature"); 20 C.F.R. § 655.103(d); *see also* 80 Fed. Reg. at 63,000; Oral Argument Tr. 41:8–41:9 ("[I]f they are permanent workers then they shouldn't get approval on a temporary basis."). The agency has no power under the statute—it is actually forbidden—to include non-temporary or non-seasonal workers in the H-2A program.

As a result, under the H-2A statutory scheme, it was incumbent on Labor at the outset to explain why sheep, goat,

and free-range herding is the type of job for which employers have only a temporary, rather than continuing or long-term, need. As Labor's own document name confesses, that temporal predicate had to be built into the regulatory process for issuing "Temporary Employment Certifications."

Labor knew that. Its Notice of Proposed Rulemaking "sought comment specifically on the issue of the temporary and seasonal nature of herder work," announced that it was reconsidering the appropriate period of need for employers to designate on their applications "to reflect more appropriately [employers'] temporary or seasonal need as required by the [Immigration and Nationality Act]." 80 Fed. Reg. at 62,999 (citing 80 Fed. Reg. 20,300 (April 15, 2015) (proposed rule)). And Labor received just that: "Comments on Temporary Need." *Id.* Labor then responded with an answer in the final regulation, permitting employers to designate their period of need as 364 days, because that was determined to be consistent with the statutory mandate. 80 Fed. Reg. at 63,000; *see* 20 C.F.R. § 655.215(b)(2). So Labor's decision that the herder positions qualify as the type of temporary work that is statutorily eligible for H-2A visas was an essential component of the 2015 Rule, fully explained and resolved by the agency. That makes it fair game for judicial review.

But we need not rely only on Labor's own affirmative burden to preserve the issue. While not always models of clarity, multiple comments in the administrative record broached the question of whether herding properly qualifies as temporary or seasonal work. As noted, "Comments on Temporary Need" was its own sub-section in the final rulemaking analysis published in the Federal Register. 80 Fed. Reg. at 62,999. A number of employers commented in support of the 364-day provision, while freely admitting that "they re-employ the same H-2A workers over the years." *Id*.

Another commenter openly proposed that "foreign herders should be permitted to stay in the United States longer than typically allowed because of the unique skills of foreign herders." *Id.* at 62,961. Worker-Advocates for herders, on the other hand, recommended "two certification periods" in response to the proposed regulation that "requires that the [job] order be no more than 364 days but does not otherwise limit the [job] application." J.A. 804; *see also id.* ("A nine month certification for an open range herder would be sufficient[.]"); *id.* ("The Department should create distinct positions at different times of the year[.]"); 80 Fed. Reg. at 62,999 (Worker-Advocates favored "two separate certification periods" for the birthing and open range season). The Worker-Advocates offered a substantial explanation of why two shorter-length certifications would be more consistent with the nature of herders' work. J.A. 804.

By far, the most telling evidence that the challenge was properly before the agency is Labor's own two-fold justification for its 364-day temporary-need provision. First, Labor explained that the statute neither "define[s] 'temporary' work" nor "indicate[s] how long a position may last and still qualify." 80 Fed. Reg. at 63,000. Neither does legislative history speak to the question. *Id.* On that basis, Labor concluded that "neither the statute nor [Homeland Security's and Labor's] regulations proscribe the 364-day period of need" adopted in the 2015 Rule. *Id.*

Second, Labor reasoned that "decades [of] unique history and experience of sheep herding * * * support the 364-day period of need for sheep ranchers." 80 Fed. Reg. at 63,000 ("We see no reason to rescind our reliance on this aspect of these jobs to shorten the period of need."). The administrative record itself accordingly bears out that Labor had a "fair opportunity" to review its interpretation of temporary need, and

did in fact do so, "in the administrative forum before [it was] rais[ed] * * * in the judicial one." *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1290 (D.C. Cir. 2004).

Sandbagging is not of concern either. Labor has long been and remains fully cognizant of the inconsistent treatment accorded to herders in contrast to all other H-2A workers. For instance, in a 2001 Field Memorandum issued by the agency regarding the Temporary Labor Certification of Sheepherders and Goatherders, Labor admitted that herders are awarded H-2A status "irrespective of the fact that most sheepherding jobs are neither temporary nor seasonal in nature." J.A. 884 ("Under INS procedures, a nonimmigrant foreign worker is permitted entry into the U.S. for a cumulative period not to exceed three years for sheepherder positions certified by DOL under its procedures.").

In light of the comments received, the analysis undertaken by Labor, the inherent necessity to address "temporary" need as an elemental component of the rulemaking and Labor's statutory authorization to act, and Labor's express justification of this aspect of its final rule, the Project's challenge to Labor's decision that herding positions qualify as temporary employment "was expressly addressed by [the agency] and is properly before the court." *NRDC v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014) (citing *Appalachian Power Co. v. EPA*, 135 F.3d 791, 818 (D.C. Cir. 1998)). For that reason, we reverse the district court's dismissal of this claim and remand for resolution of its merits.

## C

In the 2015 Rule, the Department of Labor also solicited comments on and promulgated a new minimum wage for herders. In doing so, the final rule estimated that herders work

48 hours per week and directed that, by 2018, herders must be paid $7.25 per hour. 80 Fed. Reg. at 63,026. For the two preceding years, however, Labor allowed employers to gradually adjust to the new pay rate. Labor set the minimum wage for 2016 at $5.80 (which is 80% of the $7.25 rate) and increased the wage for 2017 to $6.65 (which is 90% of the $7.25 rate). In addition, the base hourly wage is adjusted annually in accordance with the Employment Cost Index, which is "a quarterly measure of the change in the price of labor" as calculated by the Labor Department.[5] Based on those numbers, the monthly wage for herders in 2016 came out to $1,206. *Id*.

The Project argues that Labor acted arbitrarily in setting the new minimum wage because both the number of work hours per week and the hourly rate it chose were unreasonably low. Our review of such claims, though, is "narrow," and we cannot "substitute [our] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). We ask only whether Labor "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* Labor met that mark.

**1**

In its Notice of Proposed Rulemaking, Labor proposed basing its minimum-wage calculations on a 44-hour work week. 80 Fed. Reg. at 20,309. That number was the mid-

---

[5] John W. Ruser, *The Employment Cost Index: What is it?*, Monthly Labor Review (Sept. 1, 2001), available at *https://www.bls.gov/opub/mlr/2001/09/art1full.pdf*; *see also* 80 Fed. Reg. at 62,993 n.37.

point between the 40-hour week proposed by employers and the 48-hour week advanced by Edward Tuddenham, an attorney who had represented H-2A herders. *Id*. Tuddenham calculated a 48-hour week by averaging work-hour estimates from 192 temporary certification applications submitted by ranchers to the Department of Labor during the H-2A petitioning process. 80 Fed. Reg. at 62,995.

In the final rule, Labor adopted 48 hours as the appropriate measure of weekly work. 80 Fed. Reg. at 62,995. Labor reasoned that the 48-hour estimate was based on "the most diverse data set available" since it was "the only data source identified by any commenter that includes data collected across States." *Id*. (internal quotation marks omitted).

The Project launches a two-prong attack on Labor's choice, criticizing both its reliance on exclusively employer-reported data and its rejection of data from a 2010 survey of Colorado-based herders conducted by a workers' advocacy organization, in which approximately 60% of the workers stated that they worked more than 80 hours per week. Both criticisms fall short of demonstrating arbitrary, capricious, or unreasoned decisionmaking.

To start, Labor recognized up front that its work-hour estimate would "necessarily be imprecise" because herding employers had long been exempted from relevant recordkeeping requirements. 80 Fed. Reg. at 62,995. In addition, the nature of the work meant that the number of hours varied greatly throughout the year depending in large part on whether herders were working on the ranch or roaming with the herd on the range. Labor also opted against collecting its own data because it would be "very difficult and resource-intensive" due to the unique characteristics of herding, *id*. at 62,996, and in particular the fact that herders "spend[] extended

periods of time with grazing herds of sheep in isolated mountainous terrain[,]" *id.* at 62,962 (internal quotation marks omitted).

The mere fact that a "dataset was less than perfect," however, "does not amount to arbitrary decision-making." *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 61 (D.C. Cir. 2015); *see also Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994) (agency does not act arbitrarily solely for using a model even when data "indicate[s] that it is not a perfect fit"). So long as the agency "explained the available evidence" and rationally connected the facts to the choice made, it acted reasonably and its determination will be upheld. *New York v. EPA*, 413 F.3d 3, 31 (D.C. Cir. 2005).

Labor did just that. Labor surveyed the information available and concluded that the data from employers' Temporary Employment Certification applications was "the most comprehensive and detailed data source from which to establish an hourly calculation." 80 Fed. Reg. at 62,996. Unlike other proposed numbers, the 48-hour estimate factored in herding employers across America, was officially submitted by employers to Labor on agency forms, and was also endorsed by the Worker-Advocates' Joint Comment. *Id.* at 62,995. With respect to concerns that employers would underreport hours in the hope of attracting more workers, Labor noted that employers' job postings already were required to warn prospective employees that herders "must be available up to 24 hours per day, 7 days per week." *Id*. at 62,996.

Labor likewise "adequately and reasonably justified its decision not to consider" the Colorado survey of herders. *Association of Oil Pipe Lines v. FERC*, 876 F.3d 336, 342 (D.C. Cir. 2017). While the agency recognized the herder survey was "informative," the agency ultimately concluded

that its numbers were not reliable because the data source was "very limited," covering only Colorado herders, and so was "not representative of the industry as a whole." 80 Fed. Reg. at 62,996. Labor's data showed that two States have more than triple the number of sheep and goat herding employers as Colorado, *id.* at 63,021, which is significant given that herding needs vary based on terrain and climate. For those reasons, Labor's decision not to adopt data drawn from a single source to establish a national standard falls within the bounds of reasonableness. Labor adequately explained why it relied instead on a comprehensive, nationwide set of employer-reported data, and it sensibly addressed criticisms of the survey head-on. The APA requires no more in this context.

**2**

The Project separately argues that, in adopting the federal minimum wage of $7.25 per hour for herders, Labor arbitrarily disregarded evidence showing that similarly situated domestic workers receive a higher wage. The Project also contends that Labor unlawfully prioritized employers' interests over those of the herders. Neither challenge succeeds. Labor thoroughly examined the issue before it and settled on a minimum-wage rate that would be attractive to domestic workers without capsizing the herding industry as a whole.

The Immigration and Nationality Act charges the Department of Labor with ensuring that "the wages and working conditions" of United States workers will not be "adversely affect[ed]" by the entry of H-2A workers who might otherwise be employed at a lower cost. 8 U.S.C. § 1188(a)(1)(B). To that end, the Labor Department calculated an "Adverse Effect Wage Rate" that identified a minimum wage for H-2A workers that would not adversely affect the market for domestic workers. With respect to

herders, Labor initially proposed tying the Adverse Effect Wage Rate to the "combined hourly wage rate for field and livestock workers from the [Farm Labor Survey] used for all other H-2A occupations." 80 Fed. Reg. at 62,987. At that time, the Farm Labor Survey's hourly wage ranged from $10 to $13, depending on the State. *Id.* at 63,049. That would have created a threefold increase in the pay herders had been receiving. *Id.*

Facing the prospect of wages "tripl[ing]" overnight, herding employers, employer associations, State and local government officials, and others with business interests in the sheep industry submitted "hundreds" of comments attacking the Farm Labor Survey rate, warning that adopting it would "jeopardize the entire herding industry." 80 Fed. Reg. at 62,988. The majority of the criticisms fell into two categories.

First, many argued that the Farm Labor Survey was not an appropriate metric due to herding's unique characteristics. Employers contended that livestock worker positions and herders were not analogous because, unlike livestock and other H-2A workers, employers paid for herders' "food, housing, work supplies, and protective clothing, and transportation." 80 Fed. Reg. at 62,988; *see also id.* at 62,989 (Farmworker positions "pay by the hour, and do not provide housing or food, making those rates of pay completely inapposite to the range production of livestock."). In addition, employers suggested that the intensity of work varied more for herders because they were not necessarily "engage[d] in productive labor at all times while on the range[.]" *Id.* at 62,988.

Second, the industry pleaded that it was economically unable to absorb the large and sudden increase in wages proposed by Labor. Employers submitted extensive financial statements and analyses asserting that adoption of the wage

increase would lead to downsizing or closed operations. *See* 80 Fed. Reg. at 62,988 (214 employers reported that they would "downsize" or "shut down operations"; an employer association represented that the wage increase would result in an "80 percent reduction in profitability"). Employers also said that, because of rigorous competition in the global market, they would be hard-pressed to pass on cost increases to consumers. These consequences, they continued, would not just impact employers, but would also create "multiplier effects in related industries," such as "lamb processors, wool warehouses, textile mills, trucking and feed companies, veterinarians, and fencing businesses." *Id.* (internal quotation marks omitted).

On the other side of the equation, the "few comments" in favor of the Farm Labor Survey rate were "undetailed and expressed only general support." 80 Fed. Reg. at 62,990. The most relevant and specific support contradicted the industry statements, explaining that current farm and ranch workers, who are covered by Farm Labor Survey wages, "may also perform work that is closely and directly related to the production of livestock" undertaken by herders. *Id.* Although Worker-Advocates for the herders largely supported the Farm Labor Survey wage, they did not reject outright the federal-minimum-wage measure that Labor ultimately adopted. The Worker-Advocates' Joint Comment on the proposed rule acknowledged that the federal minimum wage of $7.25 was "substantially higher than the [current] herder minimum wage." *Id.*

After studying the comments and evaluating alternative approaches, Labor's final rule chose as the Adverse Effect Wage Rate the federal minimum wage of $7.25 per hour, rather than a rate based on the Farm Labor Survey. 80 Fed Reg. at 62,987. But Labor made explicit that, under the regulation,

the federal minimum wage of $7.25 per hour just established a wage floor. 20 C.F.R. § 655.211(a). Employers were still required to pay the highest of the monthly Adverse Effect Wage Rate, an agreed-upon collective bargaining wage, or the minimum wage established by applicable state law or judicial action. 80 Fed. Reg. at 62,987.

Labor reasoned that tying the baseline Adverse Effect Wage Rate to the federal minimum wage fulfilled its statutory mandate to protect United States workers because, if the higher Farm Labor Survey rate had been adopted, it would have "caus[ed] a substantial number of herding employers to close or significantly downsize their operations—leaving fewer herding jobs available to U.S. workers." 80 Fed. Reg. at 62,990. Labor also emphasized that three of the four *Mendoza* plaintiffs had attested that they would return to herding if offered the federal minimum wage. 80 Fed. Reg. at 62,994.

More to the point, Labor also presented evidence that, by the time the two-year transitional period to the full minimum wage was completed in 2018, herders across the country would be earning a monthly wage almost on par with—or within one to two hundred dollars of—the wage paid in States like California, Oregon, and Hawaii, that have historically set high minimum wages for herders under state law. *Compare* 80 Fed. Reg. at 63,026 (monthly wage in 2018 nationwide under the federal minimum wage will be $1,568), *with* 80 Fed. Reg. at 63,024 (2018 monthly wage in Oregon will be $1,679, in Hawaii will likely be $1,422.52, and in California will be equal to or more than $1,777.98).

The record also shows that Labor did not just adopt industry's preferred outcome hook, line, and sinker. Labor flatly rejected the employers' proposal to preserve the same wage rates set by the 2011 Guidance Letter, choosing instead

to impose a "significant wage increase on the industry" by adopting the federal minimum wage. 80 Fed. Reg. at 62,991. Labor explained that an increase was necessary because it "would be unreasonable to conclude that wages [were] without any influence on U.S. worker availability." *Id.* at 62,992. As Labor explained, compensation needed to "rise to attract more workers where employers are experiencing a shortage of available [domestic] workers * * *." *Id*. at 62,992; *see also id*. at 62,994 (rejecting the employers' position because it was "concerned that continued reliance on the [Guidance Letter] wages, even in indexed form, would be inconsistent with [Labor's] obligation to protect against adverse effects on U.S. workers").

The Project also expressed concern that paying herders lower wages would incentivize employers to expand the herders' duties by squeezing unrelated activities into "range" work, just to take advantage of lower costs, harming ranch workers in the process. Project Br. 55. But Labor reasonably addressed that concern, explaining that regulations separately limit the "duties" herders can perform when working at the ranch, making it less likely they can take over ranch workers' tasks. In addition, herders are required to spend more than half of their time away from the ranch "on the range." 80 Fed. Reg. at 62,991. Put simply, Labor concluded that the newly imposed wage rate would not adversely affect ranch workers because "ranch hands can perform a much broader array of work duties," so their positions were insulated from the effects of herding wages. *Id*.

At the end of the day, the question before this court is not whether Labor adopted the best wage possible. It is only whether Labor's selection of the federal minimum wage falls within the broad realm of reason, and whether Labor sufficiently explained the basis for its judgment. Labor's

decision crosses that threshold. The agency examined the data before it, considered alternatives in light of the comments received and its statutory mandate, and offered reasoned explanations for both its conclusion and its rejection of viable alternatives. Because the Department of Labor has "explained its logic and the policies underlying its choices, we have no basis for second-guessing its reasonable judgments." *North America's Bldg. Trades Unions v. OSHA*, 878 F.3d 271, 303 (D.C. Cir. 2017). On that basis, we affirm the district court's judgment upholding the 2015 Rule's minimum-wage requirement as neither arbitrary nor capricious.

**D**

Before closing the gate on this case, we must address the Project's request for a declaratory judgment proclaiming that the Department of Labor's 2011 Training and Employment Guidance Letter for sheep and goat herders is substantively invalid. Because that Guidance Letter has already been vacated, the district court dismissed that claim for lack of Article III standing. We agree that the court lacked jurisdiction over that claim.

An indispensable component of federal court jurisdiction in every case is that the plaintiff has Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy that constitutional standing requirement, a plaintiff must establish a concrete and particularized invasion of a legally protected interest that both is traceable to the defendant's challenged action and is "'likely' * * * [to] be 'redressed by a favorable decision.'" *Id.* at 560–561 (citation omitted). When the injury is caused by a third party not involved in the litigation, the plaintiff must establish that a favorable judicial decision would cause "a significant increase in the likelihood" that she would obtain "relief" for "the injury suffered." *Utah*

*v. Evans*, 536 U.S. 452, 464 (2002); *see also Lichoulas v. FERC*, 606 F.3d 769, 775 (D.C. Cir. 2010) (holding that a judicial decision reversing an agency's action would "significantly increase the likelihood" that the plaintiff would prevail in a separate court action against a different defendant).

The Project argues that its challenge to the 2011 Guidance Letter would strengthen its hand in state common-law quasi-contract, unjust enrichment, and quantum meruit claims that the Project has brought, on behalf of individual herders, against their private employers. Second Am. Compl. ¶¶ 117–126. More specifically, the Project claims that the wage terms in their employment contracts, which were based on the then-in-force 2011 Guidance Letter, should not be enforceable because the Guidance Letter's wage rate was substantively unreasonable. As a result, the Project claims, the herders are owed back pay or restitution.[6]

For purposes of standing, the Project has adequately alleged an injury-in-fact in the form of unlawfully low wages. Also, that injury is readily traceable to the wage rate set by the Department of Labor in its 2011 Guidance Letter. Where the Project runs into standing trouble is Article III's requirement that the injury be redressable by the court's judgment. The Project argues that "a judicial finding that [the Department of Labor's] implementation of the 2011 Rule violated the APA" will buttress their claims for back pay in the separate common-law litigation. Project Br. 56.

The fly in the Project's ointment is that this Court has already held the 2011 Guidance Letter to be procedurally

---

[6] These claims were transferred to the United States District Court for the District of Colorado. *Hispanic Affairs Project v. Perez*, No. 15-1785 (D. Colo. April 7, 2017), ECF No. 20.

invalid under the APA. *See Mendoza*, 754 F.3d at 1025 ("The [Guidance Letter] [is a] legislative rule[] and the Department of Labor violated the Administrative Procedure Act by promulgating [it] without providing public notice and an opportunity for comment."). As a result, the 2011 Guidance Letter was vacated on November 16, 2015. *See* ORDER, *Mendoza v. Perez*, No. 11-1790 (D.D.C. Oct. 31, 2014), ECF No. 54 at 1; 80 Fed. Reg. 62,958 (Oct. 16, 2015). That means the 2011 Guidance Letter is already of no legal force or effect.

Vacating again what has already been vacated before is not likely to afford any additional redress for the Project's or the individual herders' injuries at the hands of third-party employers. To the extent the Project believes that invalidation of the 2011 Guidance Letter will strengthen their argument in other litigation that the prior wage rates were substantively unreasonable, this court has already held that a court's procedural invalidation of a regulation can support a claim for restitution. *See Frederic County Fruit Growers Ass'n v. Martin*, 968 F.2d 1265, 1273 (D.C. Cir. 1992) (a claim for restitution "can rest solely on the invalidation of a regulation on a procedural, as opposed to a substantive, ground."); *id.* (listing cases where restitution was ordered after a rate increase was found procedurally invalid). Because this court has already ruled the 2011 Guidance Letter to be invalid and the prior wage rates have already been vacated, the Project fails to explain how another ruling about the Letter's invalidity will "*significantly increase* the likelihood" that it "prevail[s] in [its private contract] challenges and therefore make[s] it more likely that [the herders] will regain [backpay]" from the third-party employers. *Lichoulas*, 606 F.3d at 775 (emphasis added). Lacking jurisdiction to hear this claim, we dismiss it.

\* \* \* \* \*

For the foregoing reasons, we reverse the district court's holdings that (i) the Project had failed to timely preserve its claim against the Department of Homeland Security's alleged policy or practice of routinely extending "temporary" visas for lengthy periods, and (ii) the Project waived its challenge to the Department of Labor's 364-day certification regulation. We remand those claims for further proceedings consistent with this opinion. As to the remaining issues raised on appeal, we affirm the district court's judgment of dismissal.

*So ordered.*